UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

Johanna Guaypatin,

    Plaintiff,

    v.

Mall Properties, Inc.. dba Olshan Properties

    Defendant.

-------------------------------------------------------------- X

AMENDED COMPLAINT

20-cv-02771 (LJL)

**JURY TRIAL DEMANDED**

## SUMMARY

Johanna Guaypatin seeks redress for being misclassified intentionally as an exempt worker under FLSA and other laws, and discriminated against and harassed about her mild Spanish accent and then fired her – on a purely pretextual basis – on the grounds that, because she visited her daughter's school, she might have contracted Coronavirus. This is *not* a case resulting from a Coronavirus layoff, as we now understand, and employees are being laid off. Johanna should have been kept on – an international company like Olshan needs a receptionist, after all.

This is a case, rather, wherein – before the stay-at-home guidelines. The defendant, colloquially known as "Olshan Properties" wanted to terminate plaintiff because of her accent (and use of Spanish in the workplace). With no neutral reason at hand, it threw in the towel and fire her for a stated, dishonest belief of COVID infection. More specifically, a manager at Olshan said she feared – with no basis in science or other evidence – that plaintiff *might* have COVID because she visited her daughter's school in Queens. Someone at Olshan said she "had heard" – because, after all, "people are saying" – that there were many COVID cases in Queens. Olshan demanded Johanna provide proof that her daughter's school was not infected – something nigh on impossible, so she was summarily let go, weeks before COVID was what it is as of this filing.

1

## PARTIES, VENUE & JURISDICTION

1. Johanna Guaypatin is an Ecuadorian national and U.S. citizen. (In her public pursuits, she uses her formerly married name of Silva because Guaypatin is nearly impossible for English speakers to pronounce (phonetically *GWAY-pat-een*).

2. Mall Properties, Inc., known nationally as Olshan Properties, is a family-owned, Limited Liability Company organized New York laws. Its headquarters are in Manhattan.

3. Venue is proper in that the defendant resides in this district. Plaintiff resides in Queens.

4. Jurisdiction is proper, at a minimum, under the Fair Labor Standards Act, insofar as defendant contributes more than $500,000 to interstate commerce. When she is issued a right-to-sue letter, jurisdiction will also be proper under Title VII of the Civil Rights Act and the complaint is amended.

## FACTS

5. Ms. Guaypatin has several years' experience as an assistant property manager and fifteen years' experience as a paralegal. She is a certified Spanish interpreter and has a B.A. in Legal Studies.

6. She left a long-term employer, Bettina Equities Management, because she wanted to work at a bigger company, and rev up her career in real estate. She applied to Olshan Properties, a national property-management company, and it offered her a job whose description is attached hereto.

7. The new job titled "Administrative Assistant" offered Johanna entry into Olshan. It was a foot in the door to a major company that it would help her career, she thought, even if she was taking a step down in title from her earlier job.

8. She was also impressed that the company was owned by a woman, Andrea Olshan. Ms. Olshan was polite to Johanna, and none of this – as far as she knows – involved any interactions with Olshan, but discovery will so determine.

9. Ms. Olshan's team was less than effective in managing employees. Johanna was, for example, not paid according to the rules under the Fair Labor Standards Act; nor do the managers know how to comply with anti-discrimination laws.

10. Johanna's title was officially "Administrative Assistant," but was sometimes characterized as "Assistant Property Manager," even if though the job involved very little if any "management."

11. Day to day, she reported to Karyn Marasco (and some other managers), followed up on their instructions, entered information into databases, and reached out to vendors, supers and tenants. These were not the duties of an exempt employee. (Later, because of her use of Spanish and her alleged "accent," she was demoted to the title and duties of receptionist – and deemed to be exempt by the defendant.)

12. Upon information and belief, the defendant attempted to make her agree that she was exempt. Johanna signed a statement saying so.

13. But employees cannot waive the requirements of FLSA (or the New York Labor Law).

14. Even the newly U.S. Department of Labor Department's most recent rules did not allow Olshan to classify plaintiff as exempt. The U.S. Labor Department recognizes several factors to weigh to determine whether an administrative employee is exempt, including:

   a) "The employee must be compensated on a salary . . . at a rate not less than $684 per week." This factor applied to plaintiff in both roles, but the test does not end there;

3

    b)    The regs also require that the "employee's primary duty must be the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." This factor might cut slightly to Olshan, but mostly to plaintiff insofar as her work was largely manual data entry and secretarial-type for Marasco. When she was demoted to receptionist, she was a receptionist and her duties were answering the phone, greeting customers, signing for mail, translating, cleaning the kitchen and taking out garbage.

    c.    "The employee's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." By no means does this factor weigh in favor of Olshan. Johanna was allowed to use little independent judgement. Aside from the fact that she couldn't even use her judgement to speak Spanish to her employees before work started, in her role with Marasco, she simply did what she was told, and whenever she expressed any independent insight, Marasco criticized her for her accent (which is mild). This does not conflate the discrimination claims with the wage claims, but is merely an example as to how she could exercise no independent judgement in the "Administrative Assistant" cum Assistant Property Manager position. And when she was demoted to receptionist, any reasonable person has to admit that a receptionist is not a FLSA exempt position.

13.    Plaintiff worked some 45-50 hours per week. Insofar as she was making approximately $60,000 annually, this meant her hourly rate was $30 per hour for a forty-dollar-a-week job. That hourly rate, times 5-10 hours of overtime, means she was underpaid approximately $18,000. Since the underpayment was willful, the amount should be doubled. For some period, Marasco denied Johanna a lunch break, another matter worth several thousand under state law.

4

14. Here's where plain old discrimination and discriminatory harassment kicks in: Because plaintiff speaks fluent Spanish, she often translated for workers and various others at the individual properties. There were no other Spanish speakers in the office – at least who spoke English and Spanish as well as Johanna. She was an asset to the company in this way.

15. But heaven forfend she speak in a way that betrays the roots of her national origin! Johanna's English is fine and like anyone's whose first language is Spanish: you can hear a tint, not even an accent, when she speaks. Maybe once in a conversation a person speaking to Johanna might ask her to repeat a sentence, but Johanna has a most mild accent – the accent that most Spanish speakers (or speakers of other languages) cannot eliminate, not matter how much study or practice of English.

16. But Marasco, whom plaintiff was not originally assigned to work, too often (and constantly, discriminatorily) called plaintiff on her "accent," such as in, "Oh, sorry I didn't understand what you said the first time."[1]

17. This was a constant microaggression that Johanna dealt with in a politic way because she wanted to keep her job. But in meetings, sometimes in front of executives, Ms. Marasco would make Johanna repeat her statement, stating: "One more time, I can't understand." Johanna, though embarrassed to be marginalized in this way, was always apologetic and repeated her statement.

18. Others in the meeting heard these macroaggressions, and realized that Marasco was violating the American social contract, as well as anti-discrimination laws – we must expect that some people speak with accents, major or minor. The others who heard these cringeworthy

---

[1] Plaintiff had originally been assigned to work with another manager, but that manager, along with several other people, left Olshan shorty after Plaintiff arrived there.

verbal assaults often told Johanna words to the effect of "Don't worry you're fine." Upon information and belief, they were embarrassed by Marasco's actions, as any reasonable American would be.

19. One of Johanna's duties was to send out notifications letters for water shut downs (and other property events). She took dictation, and there was no problem with her dictating English. However a single water-shut-off letter was to be signed by Ms. Marasco and one Wesley Miles (a property manager at the time).

20. Inadvertently, Johanna spelled Karyn's last name wrong: "Morasco" vs. "Marasco." The letter had been reviewed by both Marasco and Miles, and each approved it. The spelling error was not made known until it was distributed to the tenants. Marasco, even though she had a chance to catch the error, was furious with plaintiff. Maybe she had the right to be slightly upset, but she had the last clear chance to see how her name was spelled – or perhaps she didn't even proofread the letter at all.

21. This had nothing to do with the use of English, but how to spell an Italian surname; both "Marasco" and "Morasco" are phonetically similar in English, Italian and Spanish (and other Romance languages).

22. Johanna was very apologetic about the mistake, but Marasco then made her life miserable.

23. She pushed Johanna to stretch her schedule; she could not take lunch. Johanna was afraid her job was in jeopardy; her aim was not to get fired.

24. Then she was demoted to receptionist.

25.     Plaintiff asked Karyn why she was being demoted, and whether it was because of her "accent." Karyn responded as if her accent had never been a problem for her, as if she never noticed it.

26.     Then she lied: Marasco said work was slow at Olshan. It was not, at least not at the time, in 2019.

27.     Soon, Johanna saw that Karyn was interviewing other people for her position. She hired a woman (who did not have an accent and was not of Latinx descent). Karyn then humiliated Johanna by requiring her to train her how to use the "MRI" (Management Residential Integration) computer system.

28.     The new employee had less experience than Johanna, and had none with MRI. Johanna also trained the less-experienced employee on filing, how to deal with superintendents, and various other tasks. She never complained, but she could see the injustice.

29.     There was no reason for the demotion; when the new employee came in, Johanna was surprised. Johanna thought the demotion was something temporary, but the receptionist supervisor disabused her of this assumption.

30.     The next time she had a chance to speak to Karyn, Johanna was called to meet in her office. During a rushed conversation, Johanna asked, "Why am I being demoted?"

31.     Karyn had originally said, "We're slow." But when the new employee came in, Johanna asked, "How can we be slow if I am given so much work and you are hiring a new employee?"

32.     Marasco said something in Corporatese, another Romance language that is not hard to spell, but impossible to understand.

33.     At about the same time, Johanna returned from surgery to remove some ovarian cysts; because of this, she needed a mild lifting accommodation.

34. No one expressed a problem with the proposed accommodation. Karyn said, "Let's see how it is for two weeks. You won't have to do much lifting."

35. This was a lie, or Karyn made a promise and just didn't care because she knew she wanted to get rid of the "accented" Johanna.

36. The receptionist job included much lifting, maintaining clean the kitchen, taking out the garbage. Johanna was not accommodated one whit. Though this was not much to a person who had *not* gone through surgery, Johanna was delicate the week when she returned, as one might expect.

36. When plaintiff mentioned this to Karyn, the latter said, "Let's wait for the holidays" to be over and we'll discuss this further. As it happened, Johanna only needed a week or two and the holidays would exceed this period.

37. Two weeks later, Johanna told Karyn, "I need to tell you that no-one trained me to be a receptionist."

38. Indeed, plaintiff needed to be trained in entering purchase orders, mail distribution to the owners, how to direct calls. Sometimes people would call about a certain thing to be directed to a particular person that plaintiff did not know.

39. Johanna was not trained on any of this, thus she had to figure it out on her own. She was smart enough to do so, but feared she was being set up. She had no experience as a receptionist and feared the most minor transgression would get her fired.

40. For example, plaintiff was assigned three email inboxes, and many other emails were cc'd to her without addressing anything to her specifically. She wasn't told what to do with the cc'd emails. She asked that people address her directly if they needed her, but this did not happen.

41. She adapted, but was concerned that she was being pushed out of the company. Indeed, sadly, she was.

42. Once, there was an alleged important package concerning "taxes" of some sort. Johanna was asked if she had received the package. She said in response – since there was so much mail – that if she signed for it, she delivered it to the person whom it was meant for.

43. The receptionist ladies at Olshan tried to set up Johanna for termination, but left fingerprints all over their evil, misguided misdemeanors – and falsifying business records is a misdemeanor – in the attempt to set plaintiff up for termination.

44. This particular package had allegedly been delivered on President's Day, 2020. As it happened, on that day, all employees left early because (for some reason) there was no heat in the office. Johanna left at 11 AM.

45. Someone had signed for the package – assuming there was a package. There was an entry on the manifest, but not only did someone forged Johanna's name, but he or she spelled it incorrectly.

46. When this happened, the meeting began: "Today is your last day due to your incompetence."

47. Johanna was shocked at the insult, but not surprised. The ladies she met with told her she had caused "a lot of commotion" because of this package, which might or might not have been real.

48. Johanna asked for specifics about how she had caused commotion, but was given no details.

49. She was not responsible for this package, if it existed, but Olshan tried to blame her and use this to try fire her.

50. Johanna, who is educated in paralegal matters, asked to see the manifest.

51. The ladies had no choice but to show it to her, and pointed to a signature on that was not hers, nor spelled correctly. To boot, the manifest had been signed after everyone had left because of the heating failure.

52. The receptionist managers who were about to fire her, could not disagree. They said, "Give us five minutes."

53. They walked out of the office they were all in, came back and said there would not be a termination today, but they had to give Johanna a warning. But for what they would not say. The signature was not Johanna's and there was no dispute that everyone had been let home early because of the heating problem.

54. Upon information and belief, the managers went behind the scenes, compared an exemplar of her signature to the one on the manifest and realized they were wrong. Perhaps they had been set up themselves, but they had not covered their tracks. Plaintiff is studying for a Notary License, and prided herself on her organization, followed the Notary guidelines to a tee and would never have signed for a package that she could not deliver to the person for whom it was intended.

55. Ultimately, the manifest did not contain her signature, so there was no reason for this "warning." It was merely a discriminatory act because of her "accent."

56. Plaintiff came in early every day to clean before the employees arrived; this was part of her duty as a receptionist and she knew the workers would begin entering and messing up the kitchen as soon as they arrived.

57. After she cleaned the kitchen, she often, before work started, spoke to her children in Spanish. She was told by one Toni Davis, operations manager, "They don't want you to speak Spanish in the office."

58. But Toni and others spoke Hebrew (or Yiddish) in the office audibly with each other. No one (apparently) disapproved of this.

59. There was also no problem when certain people spoke Chinese, which happened on occasion.

60. Now, while Olshan needed plaintiff to speak Spanish with (mostly) Spanish speaking supers at the properties, Toni also said, "Lili Selwa doesn't want you working here." Selwa is (or was) the commercial department head. Toni reported to her.

61. Speed up to March 12, 2020: Plaintiff had to pick up daughter from school because no one was available, including any babysitter she knew, nor even a school bus, as Johanna's daughter was sick. The school nurse called her and said her daughter Samantha wasn't feeling right – she has a complaint about her stomach. Johanna would have to pick her up after school.

62. Plaintiff related this to Marasco, who said to Johanna's surprise, "Put in for PTO [paid time off] and leave early." Perhaps inadvisably, Johanna added, "I just need to pick up my sick daughter."

63. Johanna left around 2:30, then picked up her daughter at 5 PM in Queens.

64. Lili and Toni then called Johanna and said, "We want to know how your daughter is doing. Does she have the virus? We want to make sure it was not Covid-19."

65. This was not information to which the ladies were entitled to know of, but they added words to the effect of, "If you were exposed, you should not come back. You need to give us the information on the school and find out if there are any COVID cases in that school.

11

66. Because the New York City Department of Education does not reveal such information, plaintiff could not provide the information and was fired.

67. Toni and Lili were not so dumb as to fear that because Johanna had visited a school in Queens, that they would contract coronavirus. They had just run out of excuses to get rid of Johanna and this was a pretext to fire her because of her accent.

68. But to tell someone in this crisis that they are fired for an attenuated fear of Coronavirus is a grotesque response to an employee who did nothing wrong at work other than have a mild accent and speak Spanish before she officially clocked into work.

69. When she was fired, defendant importuned her to sign a severance agreement on the spot, otherwise they threatened to fight her unemployment. Johanna Guaypatin is under 40 years of age, and the older worker protections do not apply to her.

70. Defendant could have gotten away with that if plaintiff had signed, but plaintiff – as defendant refused to ascertain all along – was much smarter than the workers at Olshan were and did not.

71. Johanna now sues for redress for discrimination and FLSA misclassification.

## FIRST CAUSE OF ACTION
## VIOLATION OF THE FAIR LABOR STANDARDS ACT

72. Plaintiff repeats all previous paragraphs as if set forth herein.

73. Plaintiff was, functionally, a. non-exempt employee.

74. Defendant willfully misclassified her as exempt.

75. As a result of the foregoing, defendant underpaid plaintiff in the amount of approximately $20,000 or such amount as shall be proved at trial.

76. Since the misclassification was willful, the amount should be doubled.

SECOND CAUSE OF ACTION
NEW YORK CITY HUMAN RIGHTS LAW
HARASSMENT AND DISCRIMINATION ON THE BASIS OF ACCENT

77. Plaintiff repeats all previous paragraphs as if set forth herein.

78. Defendant discriminated against plaintiff, on numerous occasions – including but not limited to harassment and termination – because of her accent, which is a function of her national origin.

79. As a result of the foregoing, plaintiff has been damaged.

THIRD CAUSE OF ACTION
NEW YORK CITY HUMAN RIGHTS LAW
DISABILITY DISCRIMINATION – PERCIEVED COVID INFECTION

80. Plaintiff repeats all previous paragraphs as if set forth herein.

81. Defendant STATED that plaintiff had to be fired because it feared that by picking up her daughter in Queens, she might have contracted COVID.

82. Whether or not Olshan lied in this statement, it was discrimination insofar as it was the reason given for her termination: Clearly, Olshan wanted to get rid of plaintiff because of her accent, yet the only reason for her termination was discriminatory.

83. Olshan capitalized on a national emergency to offer a pretext for her termination.

84. As a result of the foregoing, plaintiff has been damaged.

FOURTH CAUSE OF ACTION
NEW YORK CITY HUMAN RIGHTS LAW
DISABILITY DISCRIMINATION – FAILURE TO ACCOMMODATE

85. Plaintiff repeats all previous paragraphs as if set forth herein.

86. Defendant discriminated against plaintiff in that, despite knowing that she had just returned from surgery to remove ovarian cysts, it refused to accommodate her, not matter the lip service given to her by anyone at the company.

87. Plaintiff was impaired by the ovarian condition (and surgery) and needed relief from lifting.

88. As a result of the foregoing, plaintiff has been damaged.

## FIFTH CAUSE OF ACTION
## VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW
## DISCRIMINATION ON THE BASIS OF ACCENT

89. Plaintiff repeats and reallege all previous paragraphs as if set forth herein.

90. Plaintiff was discriminated against – including harassment, demotion and termination – because of her accent, which is a function of her national origin.

91. As a result of the foregoing, plaintiff has been damaged.

## SIXTH CAUSE OF ACTION
## VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW
## DISCRIMINATION ON THE BASIS OF ACCENT

92. Plaintiff repeats and reallege all previous paragraphs as if set forth herein.

93. Plaintiff was discriminated against – including harassment, demotion and termination – because of her accent, which is a function of her national origin.

94. As a result of the foregoing, plaintiff has been damaged.

## SEVENTH CAUSE OF ACTION
## NEW YORK LABOR LAW
## WAGE THEFT

95. Plaintiff repeats all previous paragraphs as if set forth herein.

96. Under Labor Law § 195, Olshan was (and is) required to keep records of the times plaintiff arrived and left for work. In the event it did not – as plaintiff expects – plaintiffs estimates for the amount she worked overtime must be accepted as true.

97. As a result of the foregoing, Plaintiff has been damaged.

### EIGHTH CAUSE OF ACTION
### NEW YORK LABOR LAW § 198
### DISCRIMINATION ON THE BASIS OF CHILD CARE

98. Plaintiff repeats all previous paragraphs as if set forth herein.

99. Defendant allowed plaintiff to take leave to pick up her daughter.

100. As a result of taking child-care leave, Olshan told her she must be fired plaintiff because the ladies at Olshan feared that, in picking up her child at school, plaintiff might have been exposed to COVID-19.

101. As a result of the forgoing, plaintiff has been damaged.

### NINTH CAUSE OF ACTION
### NEW YORK LABOR LAW § 201
### FAILURE TO POST WAGE REGULATIONS

102. Plaintiff repeats and reallege all previous paragraphs as if set forth herein.

103. Olshan did not post wage regulations in accordance with § 201

104. As a result of the foregoing, plaintiff has been damaged and defendant owes her such civil penalty and attorneys' fees and damages as the law allows.

### TENTH CAUSE OF ACTION
### NEW YORK LABOR LAW § 162
### FAILURE TO ALLOW SIXTY MINUTES FOR NOONDAY MEAL

105. Plaintiff repeats and reallege all previous paragraphs as if set forth herein.

106. Olshan, specifically Karyn Marasco, did not allow plaintiff a noonday meal on many occasions.

107. The defendant has the burden of keeping hours records under Labor Law § 195.

108. As a result of the foregoing, plaintiff has been damaged and defendant owes her such civil penalty and attorneys' fees and damages as the law allows.

WHEREFORE, Plaintiff demands the following relief:

1. Compensatory damages;

2. Punitive Damages;

3. Attorneys' fees under FLSA, the New York City Human Rights Law and the New York State Executive Law;

4. A requirement that Olshan post violations of Labor Law violations after suit and as required by the New York Labor Law;

5. Such other relief as the Court may deem appropriate.

Dated: New York, New York
       April 4, 2020

*Greg S. Antollino*

Gregory Antollino, Esq.
275 Seventh Avenue, Seventh Floor
New York, New York 10001
(212) 334-7397
gantollino@gmail.com